v. Petrescu v. Gabriella Petrescu v. Gabriella Petrescu v. Gabriella Petrescu v. Gabriella Petrescu v. Gabriella Petrescu v. Gabriella Petrescu v. Gabriella Petrescu v. Gabriella Petrescu v. Gabriella Petrescu v. Gabriella Petrescu v. Gabriella Petrescu v. Gabriella Petrescu Well, to go back one step, I would point out that this whole discharge summary, an allegation that Dr. Petrescu made any sort of diagnosis, isn't in this case. That's not an allegation in this case. If it were, Dr. Petrescu would come back and say, well, wait a minute, here's the competency examination and here are his medical records in the competency evaluation, which, oh, by the way, are in his medical file, which were produced to the plaintiffs prior to this case being brought. But with regard to making a finding of whether or not he was suicidal, the allegations are that he denied suicidal ideations while he was at Sim Hip and he was maintained therapeutically. Also, while Dr. Petrescu spent 75 minutes with him, which, frankly, is a lot of time for an attending physician, he also had a team. Well, Petrescu's not the attending physician. He's the psychiatrist, right? She is a psychiatrist, but in this particular case, she was the attending. But she didn't sign the report. No. The report that included the finding that he is not suicidal, she did not sign that report? There is a, again, none of this is in the record, so I apologize, but there is a competency evaluation, which is the big thick report, which goes to the district court judge, the trial court judge, excuse me, or the state, and then there's a summary, a discharge summary that gets produced when Mr. Valina was transferred to Teller County. And it is the discharge summary that your client signed? That is correct. And the claim against your client, as I understand it, is failure to provide medical care. Yes. Is that your understanding? Well, my understanding of the claim against my client, because the only damage that's asserted that relief is being sought for is the suicide of Mr. Valina. So it's a deliberate and different standard for failure to prevent suicide. Well, then I guess I'm not connecting all the way then, because if the claim is that by signing the discharge, which says not suicidal, why isn't that a failure to provide adequate care in the sense of not having the kind of medical history to reach that conclusion, and that in turn, failure to prevent the eventual suicide? Why isn't that sort of logical sequence valid in this instance? The reason that's not valid, and it is what the district court found, that an allegation of failure to provide adequate psychiatric care can constitute deliberate indifference. However, the failure to provide adequate care is an objective negligence standard, which is malpractice. Now, Farmer v. Brennan was very clear that the reason you don't apply an objective standard like that to deliberate indifference cases is because that's what state tort law is for. You can handle negligence cases and punish wrongdoers. For instance, if she misdiagnosed Mr. Valina, you could hold her liable under state law, but this case is seeking to impose constitutional liability. Therefore, she must- And therein lies my confessed confusion. Let me start there. I thought this defendant was referred to the hospital for competency evaluation, not for medical care. Is that correct? That's absolutely correct. And the charge here, the claim here against your client is a claim for what? To hold her liable constitutionally for Mr. Valina's suicide. On the basis that she provided inadequate care, that she provided an inadequate evaluation, the suicide didn't happen while the patient was in her care. It happened at the Teller County Jail, correct? Correct. So what is the, all right. I'll have to- What's the plaintiff's claim? Yeah, yeah. As I understand the plaintiff's claim is that it was a 14th Amendment violation of due process in a failure to prevent Mr. Valina's suicide, which is the basis, really, of Dr. Petrescu's qualified immunity argument, because there, she was, Mr. Valina left Dr. Petrescu's care for five days and was in Teller County's custody for those five days before he committed suicide. Once he left her custody, she had no way to evaluate his mental state. She had no way to put any sort of suicidal or suicide prevention measures into place. She essentially had no role in his care anymore. And what this case brings to the forefront is the important issue of, can a government actor be held liable for the suicide of whether it be a convictee or just a pretrial detainee, like Mr. Valina, when they're outside of their custody? Can I just ask you, you argued qualified immunity in district court and the district court said that there was not qualified immunity. Didn't you concentrate your argument in district court on the clearly established law prong of qualified immunity? I would say no. And I'll sort of explain that. And while I'm explaining this, I just want to say that I think Cox v. Galina, or excuse me, the Cox case is really dispositive of the waiver issue. Dr. Valina asserted in her opening motion dismiss both prongs of the qualified immunity defects, said they can't establish either. And once she did that, there's a presumption she's entitled to qualified immunity. And as the Cox case put it, the defendant or the plaintiff then has the unique briefing burden of attempting to overcome both prongs in their response of brief. Now, in the opening brief, Dr. Valina did not go very into much detail of either prong because it was a notice pleading complaint. And as you're seeing here, there's some frustration as to what the allegations are because it's not entirely clear. Therefore, the first opportunity that Dr. Petrescu had to address plaintiff's arguments was in her reply brief. And I'd also point out that there's no prejudice in considering these arguments regarding deliberate indifference, the first prong, because plaintiffs had the opportunity to respond to it both to Dr. Petrescu's objections to the magistrate judge's recommendation, and in their answering brief on appeal. Further, as recognized in Cox, because Dr. Petrescu is not disputing the allegations, in fact, the court has to take them sort of face value to the extent they're factual allegations. Qualified immunity can be decided as a matter of law. And therefore, even if it was waived, the Tenth Circuit can consider it from the get-go. What do you understand the clearly established, the claimed clearly established law that your client is alleged to have violated? Well, in their briefing, let me repeat the question. What do you understand the claimed violation of clearly established law that your client was alleged to have violated? You can answer the question first and then explain all you want. Okay. Help me a little. I think the allegation is that she was deliberately indifferent to his medical, his sufficiently serious psychiatric disorder, which resulted in his suicide. However, the clearly established law relied on by the district court and relied on by plaintiffs is Mata v. Seitz, which the Cox court already said, you can't simply say that it's clearly established that a detainee or criminal has a clearly established right to not be, to not have a government act to be deliberate and different to their serious medical needs. That has to be fact-specific, which is also I think the holding of Polly v. White by the Supreme Court. And here there's no case addressing the suicide of a detainee outside of a state actor's custody. And I believe that is really dispositive of this case. Thank you. Thank you very much. Thank you. So can you help us with what your claim was? Yes. You're the one that knows. Right. So the claim is, and the kind of the clearly established law that we're arguing here, is that reckless deviation from medical norms doesn't provide a qualified immunity shield because the Mata case, just a minute, you're going so fast that I have a hard time understanding you. Go ahead, please. Yes. So your answer to Judge Briscoe's question, because I have the same question. Okay. So our claim is that Dr. Petrescu recklessly deviated from medical norms when she diagnosed Robert Molina as non-suicidal and not a paranoid schizophrenic and simply just a malingerer. And that diagnosis led to a suicide because at the Teller County Sheriff's Office, at least this is what Teller County says, they relied on Dr. Petrescu's opinion in not taking suicide prevention measures. And so it's that reckless deviation from the standard of care, her failure to get prior medical records, her failure to speak with his treating physician. Well, first of all, was the defendant referred to the doctor here for care? Yeah, so my understanding is that when he's in the hospital in Pueblo, that Dr. Petrescu essentially was tasked with coming up with a diagnosis and basically not the competency, not the competency to stand trial question, but what's wrong with him essentially? Because those are two different questions. And when a doctor, when a judge refers a defendant to the Colorado State Hospital for a competency evaluation, are you saying that the judge is also saying kind of off by the side, oh, and by the way, what's wrong with him? No, I don't think that's what the judge does. I think as a medical facility, because Mr. Bellina is an inpatient, right? He's not, it's not like he's coming in and out of this facility. So the facility still has a duty to give him medical care because he's in custody. So the state still has the duty to provide this medical care. And so that's the context of Dr. Petrescu's care in this instance, is that providing medical care to... During the custodial period. Exactly. And the issue with Dr. Petrescu is essentially she went too far afield. No, wait a minute, wait a minute, not so quick. To provide care while the patient is in the custodial facility. Yes. Now the patient here, if we're going to categorize the defendant as a patient, is no longer in the care of the facility, correct? Yes, when his suicide, yes. All right, so what is the clearly established law then with respect to liability that you are relying upon? It's the reckless deviation from medical norms, is that when she establishes her medical opinion, that she has to foresee that it's going to be relied upon. Where do you get that from? Where do you get the standard? So the MEDA case is essentially what... It's the heart attack case, right? Yes, it's the heart attack case. Isn't that case so very different from this? Well, I would say... And yet there the nurse had information, this guy has chest pains, he has all of the classic symptoms of a heart attack, and she does nothing? And I think... How is this case like? I think you're right in terms of that fact, but here's why I argue that it's really on point here. It's because the nurse in the MEDA case was just simply ignoring these obvious signs, right? And we have to analyze her standard of care as a nurse, right? She's in the jail facility, she's proverbially walking by the cells, right? And this person's complaining of these problems. For a doctor like Dr. Petrescu, she has the ability to get the medical records, to talk to the treatment physicians, to do all the four things that we allege that were the reckless deviation from the standard of care in this case. And I think that's why this is similar. It's the deviation, it's the reckless deviation from the standard of care. Did the MEDA court ever adopt that as the standard? So there is argument that that holding is dicta, but I would say that... Well, is it dicta in the majority opinion? No, I would say it's not dicta. I would say... But where is it in the majority opinion? I see some reference to it in Judge Seymour's dissent. Right. So I would say that when we talk about that, it's kind of the holding from the dissent, I mean, not the holding from the dissent, but the dissent's talking about it. Well, there's something that's what the law isn't. Yes, exactly. And say that... No, no, no, wait a second, not so quick. I mean, if you're agreeing with me, then you're saying the dissent doesn't mean anything. The dissent tells us this is not the law. That's why I'm dissenting. Yes. So you're relying on the dissent to tell us that is what the law is. I'm sorry, this is, I don't understand this. No, no, so my argument is, is that when we talk about the reckless deviation from the standard of care, the dissent is describing, you know, it's the implication from the opposite essentially, that if that's the holding, that's the holding maybe not explicit in MADA, but it's necessary to the resolution of MADA. I know what's going to help the panel at least, or help me if not the panel. And that is the district court held that Peterson violated, Petrescu violated a clearly established law. Yes. What is the clearly established law that the district court found was clearly violated? I think when we talk about, when we look at that- So this case that you- It's MADA. I mean, MADA is the case that's cited by the district court. The dissent, the dissent in that case. Okay, I mean, I guess I'll plead ignorance as to exactly what, in terms of, if it was citing the dissent for its holding, I would just assume that the district court wasn't citing the MADA dissent for the clearly established law that it said it was being violated there. That when the district court adopted, or, you know, found that there was no entitlement to qualified immunity in this case, is because it found that the reckless deviation from medical norms is the clearly established law. And I think when we talk about that being, especially when we talk about interplay with Kingsley, right, because, again, I would still argue because he's a free trial detainee, Kingsley's objective test applies here. It's the objective, you know, the objective unreasonableness of the, kind of the objective recklessness, I guess, of so deviating so far from medical norms. And I think that's where, you know, counsel for the appellant talks about the state law remedy versus the constitutional remedy. And under state law, we do have a negligence remedy. But I think when we talk about the difference between recklessness and negligence, if it's reckless, then it's negligent too. Those concepts essentially encompass each other. When you prove recklessness, you've also proven negligence. Well, what if we agree with you that that should be the standard? And we say that that should be the standard. Aren't we, by saying it should be the standard, essentially saying it wasn't clearly established at the time that it was the standard? I would say that when we talked about the recklessness aspect of it, that was, you know, essentially that the public official was on notice as of 2005 from a tensor, you know, from binding precedent in the circuit, that- What's the language in that case? Let me get the case here first, so that I can follow you. Go ahead, please. So- From the majority opinion. So, Your Honor, I'll plead ignorance at this point in terms of being able to- Well, I can help you. The district court quotes one line from Meda. Quote, there is little doubt that deliberate indifference to an inmate's serious medical need is a clearly established constitutional right. And so, when we talk about the seriousness of the medical need, it's the paranoid schizophrenia that leads to the suicide, which is- But the deliberate indifference part seems to me to require notice. And so- The nurse in Meda had notice. Did this defendant have notice? Well, so the argument is that- You're arguing she should have had notice. That she's plainly incompetent. Had she dug into the records and asked the family? Yeah, because I think when we talk about qualified immunity, that seminal part of qualified immunity is it doesn't protect the plainly incompetent. Well, I'll help you a little, too, because I've got my notes now. And that is the dissent, underlying dissent, in Meda urged the court, the majority, to hold that, quote, reckless deviation from acceptable medical norms satisfies the subject component of deliberate indifference. The quote, the end of the quote, by the way, was after the word norms. That's the dissent. And I'm sorry, but we don't follow dissents. So, and I think the issue here is, is that, yes, we don't follow dissents. You're right. But I think- It sure sounds like the district court followed the dissent, right? But what I'm saying is that the district court didn't follow, that when the district court is talking about this deviation, right, is that we can't just simply say that, especially in light of Kingsley, that you have, you know, essentially, you have to be banging on the bars saying I'm having a heart attack in order to qualify for immunity. Well, maybe in light of Kingsley, Judge Seymour was right. And maybe now we should say that Kingsley, in effect, establishes the law and that we don't have to unbunk it because Kingsley vindicates the dissent in that case. But that doesn't make it clearly established. I think, even if that were what we would say here, is I think it would clearly establish it. Because I think- It would, yes. As of that moment, but we have to look at when these incidents occurred and say it was clearly established at that time. Well, and I think, you know, when we also talk about Kingsley and the kind of this issue of whether or not this norm is clearly established, I think we still need to go back to MATA and look at kind of the facts of MATA. Because I think MATA is really a factor, like any of these qualified immunity cases, right, are very factually driven in terms of who knew what when. And I think when we talk about the MATA case, it's saying, well, under the Farmer versus Brennan standard, you had subjective awareness that there was a problem and then doing nothing about it. Here, what we can still argue is that, one, Dr. Podrescu, you know, essentially knew that he had access to these medical records. Now, while she denies accessing these medical records, essentially, that's the issue, kind of the issue here is qualified immunity is not supposed to protect the plainly incompetent. When the qualified immunity doctrine was created by the Supreme Court, that's what it was talking about. That is the public policy of protecting people who are trying their best, but not to protect people who are intentionally violating the law who are plainly incompetent. Well, counsel, how do you square your factual analysis with the Supreme Court's latest decisions that narrow the clearly established standard to particularized facts? I think- Cases that would, cases with particularized facts that would put the defendant on notice. And I think in this case, what would put the particularized facts of MEDA would still put Dr. Podrescu on notice here. When we talk about a serious health condition in MEDA, it was, you know, a heart attack. In this case, it's the risk of suicide due to paranoid schizophrenia. That when we have serious, serious health conditions, we have a duty to inquire, you know, essentially the, excuse me. How did Dr. Podrescu, how was Dr. Podrescu on notice that there were, that there was a serious medical condition when the purpose of having Ms. Valina at the facility was a competency evaluation? Well, because the competency evaluation descends from the fact that he's a paranoid schizophrenic. The issue with that type of diagnosis is that one of the unfortunate symptoms of that disease is suicide. And so when you're confronted with a person who, you know, again, when we talk about this issue of Mr. Valina denying suicidal ideation, you know, essentially to allow doctors to just, you know, rely on the representations of somebody suffering from paranoid schizophrenia that they're okay is just simply a reckless deviation from any suicide. Yeah, that may not be okay, and it may be reckless. Yes. But guess what? But what's the case that tells us that that was clearly established? Well, again, I would, you know, again, to this argument that, well, we have to find a circuit, you know, an appellate court decision that has the exact same facts as this case before we can say there's no qualified immunity. I think we have to square these holdings of the Supreme Court with the fact that when we do the qualified immunity analysis now, we can skip, kind of skip steps. No longer are we kind of compelled under the two-step inquiry to, you know, figure out the right and then figure out whether it's not clearly established. So, counsel, your case rises and falls on MEDA. Is that fair? Yes. So I think when it comes to the denial of qualified immunity to Dr. Petros. So if we're writing the opinion, we can say that then. Counsel concedes that his case rises and falls on MEDA. I think that- And so we begin with that analysis. Yes, I think MEDA is the case that we point to as providing the warning for Dr. Petroscu as to what would create constitutional liability in her case. And I guess with my final time, as to any of the state law issues, I think, again, we've pled sufficient facts to sustain denial of summary judgment as to that. It's a mere negligence standard. While appellant argues that the jail had to create the condition, that's just not true under the law. They had a duty to take care of this man and they did not. Thank you. Thank you. This case is submitted. Your Honor. Yes? If I may, I just beg that the court indulges me one second. A lot of both in the last argument and this argument, plaintiff was discussing a case called Kingsley. That's never been briefed in this case. Yes, yes. We are aware. Okay. All right. Thank you. This case is submitted. We'll take a-